## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| COVENTRY PUBLIC SCHOOLS,<br>            Plaintiff,<br><br>      v.<br><br>RACHEL J. and WILLIAM J., individually<br>and on behalf of WJ,<br>                  Defendants. | )<br>)<br>)<br>)<br>)   C.A. No.: 11-259-M<br>)<br>)<br>)<br>)<br>) |

### MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Judge

This matter is before the Court on cross-motions for summary judgment (ECF Nos. 16 and 19) that arise from the decision ("Decision") of an Impartial Due Process Hearing Officer ("Hearing Officer") (ECF No. 1-1) who ruled that the parents' ("Parents") unilateral placement of their child ("Billy"[1]) in the F.L. Chamberlain School ("Chamberlain School"), an out-of-state therapeutic residential school in Middleboro, Massachusetts, was necessary to afford him a free appropriate public education ("FAPE") under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA" or the "Act"). In his Decision, the Hearing Officer required that Coventry Public Schools ("Coventry") reimburse Billy's Parents for the cost of placing him at the Chamberlain School and required Coventry to continue funding his education there.

Upon review of the voluminous record, including transcripts, extensive briefing, and lengthy oral arguments, this Court AFFIRMS the Hearing Officer's Decision for the reasons set

---

[1] The Court calls the minor child "Billy" for convenience of reference and to provide him some privacy.

forth below.[2]

## I.   FACTS

Billy has struggled since his birth in August of 1995 with a variety of attentional, emotional, and behavioral disabilities such that he is entitled to benefits under IDEA.[3]   He has had an Individualized Education Plan ("IEP") provided under the Act since he started kindergarten at five years old.   These disabilities have severely disrupted Billy's ability to function in school in a number of educational settings and have impeded his academic progress and essential academic skills.   In addition to his current enrollment at the Chamberlain School, Billy's disabilities have required that he be placed in two out-of-district placements prior to reaching the sixth grade.

### A.   ACADEMIC HISTORY

Billy's disabilities were evident from the very start of his life.   In 1996 when Billy was only a year old, his mother was forced to seek help for his behavioral disabilities from neurologists. (Hearing Tr. 9-2-10 at 67-68);[4] *see also* Appendix to Defendants' Motion for Summary Judgment, Tab #1 ("Def. App. #1").   Medication was prescribed but it was not effective. (Hearing Tr. 9-2-10 at 68.)   A day care he attended initially requested that he only attend part-time due to his disruptive behavior. *Id.* at 72.   This behavior became so extreme that the day care asked his Parents to remove him from the day care center entirely. *Id.* at 78-79.

---

[2]  This Court acknowledges that it has taken a long time to issue this Memorandum and Order – over eleven months since Coventry's motion was filed and over six months after it was argued. The Court carefully and thoroughly reviewed the 1852 pages of hearing transcript and 108 exhibits contained in the record. The briefing was also extensive – Billy's Parents' brief was 121 pages long and Coventry's brief was 74 pages. For this understandable delay, this Court extends its apology to the parties and their attorneys.

[3]  In referencing the IDEA, this Court includes the regulations.

[4]  The Court received the transcript of the eleven days of hearing in hard copy as Appendix 3 to Coventry's Memorandum in Support of its Motion for Summary Judgment. (ECF No. 17.) The Court will refer to the transcript by hearing date and transcript page.

Billy's Parents then sought the assistance of Dr. Rowland Barrett and Dr. Jeffrey Hunt of Bradley Hospital in East Providence, Rhode Island. ("Bradley Hospital"). *Id.* at 74-78. Dr. Barrett was the Chief Psychologist for Bradley Hospital and the Director of the Center for Autism and Developmental Disabilities and an Associate Professor at Brown University School of Medicine. (Hearing Tr. 11-18-10 at 58.) Dr. Hunt was the Director of the Adolescent Program at Bradley Hospital. Bradley Hospital is the nation's first psychiatric hospital devoted exclusively to children and adolescents. *Id.* at 59. According to its website, Bradley Hospital has "established itself as the national center for training and research in child and adolescent psychiatry." BRADLEY HOSPITAL (Sept. 28, 2012), http://www.bradleyhospital.org.

In 1999 when he was three years old, Warwick Public Schools had Billy evaluated by Memorial Hospital of Rhode Island who determined that he had social, emotional, organizational, and behavioral needs. Memorial advised that he would be best served by a placement outside of the school system with Child, Inc. for a full-day Pre-K Program with resources for his behavioral issues. (Def. App. #2 at 8.) ("[Billy] has recently been placed in a new preschool setting at Child, Incorporated, which appears to be a more appropriate placement given his significant behavioral difficulties at school.") Warwick's own educational assessment found Billy to be inattentive, disobedient, emotional, and hyperactive. *Id.* at 9. The report states:

> Behaviorally, [Billy] presents as a very challenging child with a constellation of difficult behaviors. We commend [Billy's mother] for securing counseling services, as it will be critical to address these behaviors in the context of a therapeutic setting to insure that they do not escalate further.

*Id.* at 9.

Billy and his family then moved to the Town of Coventry in 2001. Billy's IEP for first grade stated that Billy "needs a behavioral management plan." (ECF No. 1-1 at 8.) His psychological evaluation (Def. App. #3), his educational evaluation (Def. App. #4), and

Coventry's Team Summary and Recommendations (Def. App. #5) all documented that Billy needed a "positive behavioral management system."   (Def. App. #4 at 2).

Billy's family moved after first grade and Billy transferred to the Town of Gloucester schools ("Gloucester") for second and third grades.   Billy's Gloucester IEP described his needs as "behavioral."   His setting was a self-contained classroom with a special education teacher. (ECF No. 1-1 at 9.)  Billy failed third grade and was not promoted to fourth grade.  (Def. App. #6.)  Billy was required to repeat third grade for the 2004-05 school year.

Gloucester referred Billy to the private Emma Pendleton Bradley Day School ("Bradley School") at Bradley Hospital for fourth grade.  (Def. App. #8.)  This was the second time a school system determined that Billy required an out-of-district school placement.  His IEP in August 2005 recommended that he stay at this placement and highlighted his non-compliant behaviors.  (Def. App. #9 at 3.)   In addition to a self-contained classroom with a special education teacher, a therapist was assigned to Billy's home for thirty sessions to devise behavior management strategies.  (ECF No. 1-1 at 10.)  His classroom utilized a behavioral program. (Def. App. #9 at 3.)

Psychologists at Bradley Hospital evaluated Billy in May of 2006.  The team found that his "performance on his assessment was likely negatively impacted by these attentional and behavior difficulties."  (Def. App. #10 at 4.)  Billy was discharged from Bradley School in August of 2006.  His discharge summary stated that "[w]ith a consistently administered reinforcement-based behavior management plan, he slowly began to improve."  (Def. App. #12 at 1.)

Billy returned to Coventry schools in the fall of 2006 to begin fifth grade in a self-contained therapeutic classroom with a special education teacher and one-on-one services.  (ECF

No. 1-1 at 11.) In some core subjects, Billy did not perform well. For example, he received no grade at all for the second or third trimesters in science and received no grade for all three trimesters in social science. It appears from his report card he either did not attend, or did not receive any grade for Music, Art, or Health. He obtained passing grades in Reading, Writing and Math, but his NECAP[5] test scores showed that he was substantially below proficiency – the lowest possible category – in Reading and Math. (Def. App. #13.)

In the fall of 2007, Billy entered sixth grade. The social worker at Billy's school stated that "[a]t the elementary level he was in a Behavioral Self-contained class, which was his recommended placement for academic 2007-08. His class this year numbered fewer than ten students, and featured extremely consistent behavior management, with clear expectations and a level system that was applied with noteworthy consistency." (Def. App. #22.) Despite all of that effort, the teachers found that: "[o]ur concerns for [Billy] center on his conduct, and most importantly on the lack of progress we have seen in any improvement in his conduct." *Id.* (Emphasis added).

The Special Education case manager for Billy stated:

Academics: [Billy] is a very capable student. His behaviors continually get in the way of his academic work. When his behaviors are controlled he is more than capable of work that is close to his grade level. Because of his behaviors he has missed some essential skills, which have set him back. When included in the regular academic setting, it is a challenge to keep him appropriately engaged. When the students are participating in group activities, [Billy] will try to take charge of the group which frustrates his peers."

(Def. App. #21) (Emphasis added).

On December 19, 2007, Coventry convened an IEP Team and prepared a new IEP for Billy. (Def. App. #17.) Despite a long history of behavior issues impeding his academic

---

[5] NECAP's are the New England Common Assessment Program, state-wide tests administered through the Rhode Island Department of Elementary and Secondary Education.

progress, Billy's IEP for sixth grade contained no goals, objectives, or statements of present levels of performance for social, emotional, or behavioral functioning. It contained only four goals and those were for basic academics only – reading (2), writing, and math. *Id.* The absence of social, emotional, and behavioral goals was clearly not the result of any dramatic improvement in Billy's social emotional or behavioral functioning. The IEP itself acknowledged that he needed a consistent, structured behavior system with well-understood consequences. *Id.* at 9. Coventry Special Education Director Sue Lyons admitted that the IEP should have contained behavioral and social skills goals. She said "if I wrote that IEP . . . and I knew about some of his needs, would I include a behavioral goal and a social skills goal? Yes, I would." (Hearing Tr. 1-25-11, at 109.)

Despite the sixth grade teachers' many and varied efforts to enable Billy to make any progress, the evidence appears to show the lack of progress despite these efforts. In the spring of 2008, his teacher's note states that "Behavior is a major concern at this time." (Def. App. #19.) At the end of sixth grade, in June 2008, Billy's teacher wrote that his "behaviors continually get in the way of his academic work," and that "[b]ecause of his behaviors he has missed some essential skills, which have set him back." (Def. App. #21.) She concludes by saying that "[w]hen included in the regular academic setting, it is a challenge to keep him appropriately engaged." *Id.*

In light of the lack of academic progress and the lack of behavioral goals in his IEP, Billy's mother began to investigate out-of-district placements for him. She turned again to Dr. Roland Barrett, the Chief of Psychology at Bradley Hospital, for advice on Billy's educational setting. (Hearing Tr. 9-2-10 at 182.) Dr. Barrett had treated Billy for a number of years. *Id.* Based on Dr. Barrett's recommendation, and after consulting two other medical professionals

and visiting the school, Billy's Parents decided to enroll him at the Stone Mountain School ("Stone Mountain") in Black Mountain, North Carolina. *Id.* Stone Mountain is a residential school for teenage boys with behavioral and learning difficulties.

After making the decision concerning Billy's educational setting and believing that the IEP did not provide a FAPE for Billy, his mother wrote to Coventry on June 17, 2008 notifying them that she was removing Billy from the Coventry system and enrolling him in a private residential school. She also informed them that it was her intent that such placement would be at public expense. The letter stated that the reasons included Billy's difficulties in school, his lack of improvement, lack of goals in the IEP and lack of a current evaluation. (Def. App. #24.) Coventry's Director of Special Education responded by letter dated June 24, 2008, asserting that Coventry believed that the December 2007 IEP "clearly defines his strengths, needs, goals and objectives." (Def. App. #25.) It rejected the out-of-district placement. *Id.* Coventry did not schedule or convene another IEP meeting concerning Billy.

Billy enrolled in Stone Mountain on July 8, 2008. (Hearing Tr. 10-5-10 at 3-4.) Behavioral issues and lack of academic progress continued and Billy withdrew from Stone Mountain in September 2009 upon the school's recommendation. *Id.* at 22-23. He then enrolled in an eight week wilderness camp program with SUWS of the Carolinas Wilderness Camp, but he did not complete the program and returned home to Rhode Island in the fall of 2009. *Id.* at 25-26.

Billy's Parents notified Coventry in writing on December 30, 2009 that he was no longer enrolled in Stone Mountain and that he would be enrolling in the Chamberlain School.[6] (Def. App. #26.) While at Stone Mountain a psychoeducational evaluation was done on Billy that

---

[6] Notice was sent in conformity with the statutory requirements pursuant to 20 U.S.C. § 1412 (a)(10)(c)(iii).

recommended a "highly structured residential program that specializes in children with significant attentional issues that impact their behavior and that can provide smaller classroom and group settings to allow for immediate individualized response to behaviors." (Def. App. #29 at 16.) Chamberlain School fit that bill; it is a private non-profit school for children eleven to eighteen years old (middle school to high school) with a wide variety of emotional and learning difficulties. (ECF No. 1-1 at 25.) Coventry responded to the notice the next day and referenced the two-year-old 2007 IEP. It expressed its desire to convene an IEP meeting. (Def. App. #27.) However, Coventry never convened the meeting. (ECF No. 1-1 at 24.)

Billy enrolled in the Chamberlain School in February of 2010. (Hearing Tr. 10-5-10 at 27.) He was fourteen years-old at the time. Dr. Barrett of Bradley Hospital, who had treated Billy since he was four years old, concluded that his "behavior has always greatly exceeded the challenges presented by the vast majority of children with ADHD and ODD [oppositional defiance disorder] *** [Billy's] psychiatric presentation was unique, not necessarily in terms of its profile and characteristics, but rather in its intensity and recalcitrance." (Def. App. #32 at 2.) He went on that "it is abundantly clear that [Billy] requires a unique special education setting, such as the F. L. Chamberlain School . . . [that] will allow him to make the behavioral gains necessary to ensure reasonable academic progress." *Id.* Dr. Barrett predicted a dire forecast for Billy if he were not placed in a therapeutic residential setting such as the Chamberlain School. (Hearing Tr. 11-18-10 at 88-89.) He said Billy needed a "full court press, 24 hours a day and, you know, let's take it for a couple of years and see if we can't get him back into the public school system at that point in time." *Id.* at 138.

Bonnie Glickman, an educational consultant and nationally certified counselor observed Billy at the Chamberlain School in two different classrooms and during group therapy. Her

opinion was that Billy "was at an extreme end of the behavior and lack of compliance." (Hearing Tr. 10-18-10 at 46.) She stated that his behavior was unrelenting. *Id.* at 46-47. It was her opinion that the Chamberlain School was an excellent match for Billy's educational, social, and emotional needs. (Def. App. #31 at 3.)

The Chamberlain School formulated an IEP for Billy in April 2010 together with a treatment plan. They prescribed a variety of behavior goals and controls. Debbie Winston, the lead special education teacher at the Chamberlain School described Billy as having significant behavioral issues with disruptive and destructive behavior and improper language. He is a "very challenging student. He's one of our most challenging students. I mean, we're able to handle him, but he takes a lot of effort." (Hearing Tr. 10-6-10 at 77.) During his first year at the Chamberlain School Billy began to show some academic growth, with his 2010 test results on the Woodcock Diagnostic reading battery going from the 6th percentile to the 17th percentile. *Id.* at 80-82.

Jill Sayward is a licensed clinical social worker at the Chamberlain School. (Def. App. #30.) She describes Billy as having academic, social, and residential environment impairments, who exhibits oppositional, disruptive, and defiant behavior with significant anxiety disorder. This serious diagnosis requires intensive services just short of hospitalization. She testified:

> I would have significant, significant concerns if [Billy] were in a less restrictive setting. I think he needs, not only the kind of the continuity of the 24-hour eyes on him, people communicating, being aware of kind of everything that's going on with him, and also kind of the consistent, tight, tight structure. * * * [F]rom what I've observed, any kind of loosening of the structure or discrepancy that may come up, he starts to kind of unravel a bit. * * * I would think in a less restrictive setting, could result in not only harm to himself, but could also get him in a lot of trouble.

(Hearing Tr. 10-6-10 at 142-143.) Ms. Sayward noticed some improvement in Billy's social interactions with a group of his peers at the Chamberlain School and noted that his behavior in

the residence has improved. *Id.* at 144. Anita Offley, Billy's dorm house manager said that since October 2010 Billy has learned to connect with others and has acquired better social skills. (Hearing Tr. 2-18-11 at 146.)

## B.   HEARING

Billy's Parents filed a Request for an Impartial Due Process Hearing pursuant to 20 U.S.C. § 1415(f) in June of 2010 wherein they sought to have Coventry held responsible for the costs of Billy's out-of-district placement.[7] *Sebastian M. v. King Philip Reg'l Sch. Dist.*, 685 F.3d 79, 84 (1st Cir. 2012) ("Parents who are dissatisfied with their child's IEP may demand an administrative due process hearing before a designated state educational agency.") It was the Parents' burden at the state education hearing because they were the party seeking relief. *Schaffer v. Weast*, 546 U.S. 49, 57-58 (2005). They alleged that because of the nature and severity of his disabilities, Billy needed a placement in a therapeutic, residential school in order to make educational progress in his areas of need. They asserted that the IEP for Billy did not meet his needs because it did not contain any behavioral goals.

A Hearing Officer was appointed pursuant to 20 U.S.C. § 1415. After a pre-hearing conference, the hearing commenced in September of 2010. There were twelve hearing sessions over a period of five months. The parties presented twenty-two witnesses and 108 exhibits, and the hearings produced 1,852 pages of transcript. The Hearing Officer issued his decision on May 29, 2011. (ECF No. 1-1.)

Coventry convened two IEP meetings during the pendency of the administrative hearings, on October 27, 2010 and November 3, 2010. Billy's Parents attended both of these meetings.

---

[7] At the due process hearing, Billy's Parents initially sought the costs for the Stone Mountain, the SUWS Wilderness Camp, and the Chamberlain School. In this matter, they have limited their request to the costs of the Chamberlain School.

However, Coventry never proffered a completed IEP as a result of either of these meetings, presenting instead a "Draft IEP" (Def. App. #34) that Special Education Director Lyons acknowledged, was incomplete.[8]   This draft IEP was indeed "incomplete" in a very fundamental aspect - it did not delineate what kind of placement Coventry was proposing for Billy.  As Director Lyons testified, the IEP form had a specific box on which the child's "p l a c e m e n t" was to be described.  The IEP form made clear the information that was to be included in this box, with the words: "Placement: The services described within this IEP place this student in the following category on the continuum of special education placements."  *Id.*  This box was deliberately left blank, Director Lyons testified, because "we had not made a determination" as to placement. (Hearing Tr. 1-25-11 at 131.)[9]

After presiding over twelve days of hearing and reviewing all of the exhibits, the Hearing Officer made the following relevant findings of fact:

1. The Student has as a result of his diagnosis of ADHD and ODD, a severe behavioral disorder[10] that severely and negatively impacts his classroom skills, his social skills, and his ability to interact with teachers and adults and his peers.

---

[8] This new draft IEP was proffered only after more than two years had elapsed from the date the Parents had delivered their notice of unilateral placement to Coventry's Director of Special Education, and after five months had elapsed from the time the Parents had filed their Request for Impartial Due Process Hearing.

[9] An IEP that does not clearly explain the nature of the child's placement is legally inadequate, because every IEP must include "the anticipated frequency, *location*, and duration" of educational services. 20 U.S.C. § 1414(d)(1)(A) (emphasis added).

[10] Coventry makes much of the Hearing Officer's use of the term "behavioral disorder" claiming that this is not a qualified disability under Rhode Island's special education regulations. Coventry's protest is misplaced.  As the Parents point out, "The Hearing Officer was doing no more than using the term 'behavior disorder' in a manner frequently used not only in common parlance, but by mental health professionals, government agencies, and indeed, by Justices of the United States Supreme Court." (ECF No. 19-1 at 108); *see also* the dissenting opinion in *Davis v Monroe*, 526 U.S. 629, 665 (1999) ("The Individuals with Disabilities Education Act [], ..., moreover, places strict limits on the ability of schools to take disciplinary actions against students with *behavior disorder* disabilities. . ..")

11

*****

3. The evaluations of the Student by Dr. Cara B. Reeves and Dr. Rowland Barrett are the most accurate evaluations of the student in light of the probative evidence.

4. The Student's progress toward control of his behavior progresses and regresses for yet unanswered reasons.

*****

6. The Student's severe behavioral disorder does severely and negatively impact his academic progress; and further, such behavior disorder was unrelenting both during his classroom hours and his non-classroom hours.

7. The LEA, while evidencing a true effort to aid the Student in a public school setting, has been unable to cope with the needs of the Student in a public school setting; and as a result, failed to provide FAPE.

8. The IEP of 12/19/07 in Petitioner's Exhibit #29 fails to provide for FAPE for the Student due to the absence of clearly delineated behavior goals and clearly delineated behavior modification methods for the Student in light of his lengthy history of behavior disorder and its negative impact upon his potential for academic progress.

*****

11. The Parents of the Student gave proper and timely notice to the LEA of their rejection of the placement for failure to provide FAPE at the LEA's public school and the IEP and their intention to enroll the Student at public expense in a private school, both as to the Stone Mountain School and at the F.L. Chamberlain School. See Regs. Section 306.148(d).

12. While the LEA did give notice to the Parents that it intended to reconvene an IEP for the Student following the notice received by letter of December 30, 2009 and its reply of December 31, 2009, the LEA did not reconvene an IEP Team for the Student prior to the enrollment of the Student on February 17, 2010 at the F.L. Chamberlain School. The Parents at no time refused to make the Student available for evaluations. See Reg. 306.148(d)(2). The actions taken by the parents were reasonable on behalf of the student.

13. The enrollment of the Student at the F.L. Chamberlain School was necessary for educational reasons, was reasonable and in the best interest of the Student which, in light of his disabilities, was reasonable [*sic*] calculated to provide the Student with a proper behavior modification program to allow him to make academic progress in the least restrictive environment for him.

(ECF No. 1-1 at 34-36.)

The Hearing Officer found that Coventry failed to provide Billy with a FAPE "due to the

12

absence of clearly delineated behavior goals and clearly delineated behavior modification methods for [Billy] in light of his lengthy history of behavior disorder and its negative impact upon his potential for academic progress." *Id.* at 35. He concluded that "[t]he evidence is clear and convincing that a therapeutic residential placement *** is necessary." *Id.* at 31. He ordered Coventry to provide for the room, board, tuition, and associated costs of Billy at the Chamberlain School and for Coventry to reimburse his Parents for those expenses already incurred. *Id.* at 37.

Coventry filed suit in this Court on June 24, 2011 seeking review of the state education Hearing Officer's Decision pursuant to 20 U.S.C. § 1415(i)(2).[11]

## II.   STANDARD OF REVIEW

Coventry is seeking to overturn the Hearing Officer's Decision, and thus bears the burden of proof in this case. *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 991 (1st Cir. 1990) ("in cases arising under the Act, the burden rests with the complaining party to prove that the agency's decision was wrong.") The question for this Court is whether Coventry has met its burden to prove that the Hearing Officer was wrong in finding that Billy was denied a FAPE and that Chamberlain School was an appropriate placement.

When an action is brought in District Court challenging a hearing officer's decision, the IDEA provides that the District Court:

(i)     shall receive the records of the administrative proceedings;
(ii)    shall hear additional evidence at the request of a party; and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415 (i)(2)(C)(i)-(iii).   The Court's standard of review in this type of case "holds an intermediate position between administrative deference and de novo review," and has been

---

[11] ". . . any party aggrieved by the findings and decision made under this subsection, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section . ."

deemed "involved oversight." *Cranston Sch. Dist. v. Q.D.*, C.A. 06-538ML, 2008 WL 4145980,

at *8 (D.R.I. Sept. 8, 2008); *see also Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1086 (1st Cir.

1993); *Roland M.*, 910 F.2d at 989. The Court is "not at liberty to either turn a blind eye to

administrative findings or to discard them without sound reason." *Lenn*, 998 F.2d at 1087.

Indeed, the Court's "independence is tempered by the requirement that the court give 'due

weight' to the hearing officer's findings," that "reflects the concern that courts not substitute

their own notions of educational policy for that of the state agency, which has greater expertise

in the educational arena." *Lt. T.B. ex rel. N.B. v. Warwick Sch. Comm.*, 361 F.3d 80, 83-84 (1st

Cir. 2004) (citing *Roland M.*, 910 F.2d at 989); *see also Board of Educ. of Hendrick Hudson*

*Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 207 (1982).

> The achievement of the federal Act's goal – free appropriate public education for
> disabled children – will occur primarily via state efforts.   We believe this
> approach properly locates the federal interest at stake and limits federal intrusion
> into the relations between states and their political subdivisions.
>                                         * * *
> Under the approach we have outlined, these findings by the state hearing officer
> must be reviewed as bearing on the federal right to an appropriate education and
> must receive the court's specific consideration.

*Town of Burlington v. Dep't of Edu. for Commonwealth of Mass.*, 736 F.2d 773, 792 (1st Cir.

1984).

Moreover, "[j]urists are not trained, practicing educators.   Thus, the statutory scheme

binds trial courts to give 'due weight' to the state agency's decision in order to prevent judges

from 'imposing their view of preferable educational methods upon the States.'" *Roland M.*, 910

F.3d at 989 (quoting *Rowley*, 458 U.S. at 207). "When, as in this case, the Court decides the case

on the basis of the administrative record, the parties' cross-motions for summary judgment serve

as a procedural device, in which the burden of proof rests with the party seeking to overturn the

Hearing Officer's Decision." *N.F. v. Chariho Reg'l Sch. Dist.*, C.A. No. 11-177-ML, 2012 WL

723124, at *6 (D.R.I. Mar. 1, 2012); *see also Roland M.*, 910 F.2d at 991.

## III.   STATUTORY FRAMEWORK

Before the Court delves into the case law viewed through the lens of these facts, it is important to briefly discuss the statute that drives this litigation, the IDEA. "'Congress designed the IDEA as part of an effort to help states provide educational services to disabled children.'" *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 34 (1st Cir. 2012) (quoting *C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279, 284 (1st Cir. 2008)); *see also Schaffer*, 546 U.S. at 52. It is a scheme of statutes where, in exchange for federal funds, states must meet minimum standards of educational services for disabled children. *Esposito*, 675 F.3d at 34. "The IDEA's central requirement is that states identify children with disabilities who need special education and prepare an 'individualized education program' [] so that the child receives a 'free appropriate public education' []." *Cranston Sch. Dist.*, 2008 WL 4145980 at *4 (quoting 20 U.S.C. § 1412(a)).

### A.   The IEP

The IEP is the "centerpiece" of the IDEA. *Maroni v Pemi-Baker Reg'l Sch. Dist.*, 346 F.3d 247, 256 (1st Cir. 2003). It is the "primary vehicle" for delivery of a FAPE. *Lessard v. Wilton Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 23 (1st Cir. 2008). "The IEP must include, at a bare minimum, the child's present level of educational attainment, the short- and long-term goals for his or her education, objective criteria with which to measure progress toward those goals, and the specific services to be offered." *Lessard*, 518 F.3d at 23; *see also Schaffer*, 546 U.S. at 53. Moreover, an IEP "must target '*all* of a child's special needs,' whether they be academic, physical, emotional, or social." *Lenn*, 998 F.2d at 1089 (citing *Burlington*, 736 F.2d at 788) (emphasis in original); *see also Roland M.*, 910 F.2d at 992 ("purely academic progress . . .

is not the only indici[um] of educational benefit"); *Timothy W. v. Rochester, N.H. Sch. Dist.*, 875 F.2d 954, 970 (1st Cir. 1989) (observing that "education" under the Act is broadly defined). "[T]he IEP must include information about the child's disabilities, a statement of educational goals, a description of the measures that will be used to determine whether the child has met those goals, and a compendium of special education and related services that will be furnished to the child." *C.G. ex rel. A.S.*, 513 F.3d at 285 (citing 20 U.S.C. § 1414(d)(1)(A)).

### B.      Unilateral Placement

One of the IDEA's procedural safeguards to ensure that states are providing a FAPE to students with disabilities is tuition reimbursement for private school placement where appropriate. *See* 20 U.S.C. §§ 1412(a)(10)(c)(ii), 1415. "The IDEA provides that 'a court or a hearing officer may require the agency to reimburse the parents for the cost of ... enrollment [in a private school] if the court or hearing officer finds that the agency had not made a free appropriate public education [FAPE] available to the child in a timely manner prior to that enrollment.'" *Cranston Sch. Dist.*, 2008 WL 4145980 at *5 (quoting 20 U.S.C. § 1412(a)(10)(c)(ii)). The court must also find that the private school is a proper placement in order for the tuition to be reimbursed. *See Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15 (1993); *see also* Rhode Island Special Education ("RISE") Regs. 300.148(c). For their part, parents are required to give written notice to the public agency that "they were rejecting the placement proposed by the public agency to provide a FAPE to their child, including stating their concerns and their intent to enroll their child in a private school at public expense" ten business days prior to the removal of the child from public school. 20 U.S.C. § 1412(a)(10)(c)(iii). Failure to provide the notice may result in denial of or reduction in tuition reimbursement.

Dissatisfied parents who unilaterally remove their child from public school and place their child in a private school may demand an administrative due process hearing before a designated state educational agency to determine if they are entitled to reimbursement for private school enrollment.[12] *See Sebastian*, 685 F.3d at 84 (citing 20 U.S.C. § 1415(f)).

## IV.   ANALYSIS

There are two prongs to the Court's consideration of this appeal – 1) was Billy denied a FAPE and 2) if so, is the Chamberlain School a "proper" placement such that Billy's Parents are entitled to be reimbursed for past costs and Coventry should be responsible for current and future tuition costs?

### A.   Denial of FAPE

The first prong in determining whether Billy's Parents should be reimbursed for his private school placement[13] is deciding whether Billy was denied a FAPE. "The 'free appropriate public education' required by the Act is tailored to the unique needs of the handicapped child." *Rowley*, 458 U.S. at 181. The "'basic floor of opportunity' provided by the Act consists of

---

[12] The parents must provide a due process complaint notice to the state and local educational agencies, to which the educational agency must respond within ten days.   20 U.S.C. §§ 1415(b)(7), (c)(2)(B). Within fifteen days of receiving the parents' complaint, the educational agency is required to hold a meeting to attempt a resolution of the complaint.   *Id.* § 1415(f)(1)(B)(i). If the issue is not resolved within 30 days of this meeting, the parents have the opportunity for an impartial due process hearing conducted by the state or local educational agency. *Id.* §§ 1415(f)(1)(A), (B)(ii). The parties must disclose to each other all the evaluations and recommendations that they intend to use at the hearing at least five days before the hearing begins.   *Id.* § 1415(f)(2).   A party aggrieved by a hearing officer's decision has the right to appeal to a federal district court. *Id.* § 1415(i)(2).

[13] The United States Supreme Court has ruled that the IDEA does authorize reimbursement of parents' "expenditures on private special education for a child if the court ultimately determines that such placement, rather than proposed IEP, is proper under the Act." *Town of Burlington*, 471 U.S. at 369. This conclusion is based on the Act's direction to "grant such relief as [it] determines is appropriate." The ordinary meaning of these words confers broad discretion on the court." *Id.*

access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Id.* at 201. A FAPE provides a reasonable probability of educational benefits with sufficient supportive services at public expense. *Id.* at 189. The educational benefits as set forth in an IEP must be "reasonably calculated" to achieve effective results and demonstrable improvement in the various educational and personal skills identified as special needs. *Id.* Because the Hearing Officer found that Billy was denied a FAPE, Coventry has the burden to show that the Hearing Officer was wrong. *Roland M.*, 910 F.2d at 991. This Court has determined that Coventry has failed to meet its burden.

The First Circuit has held that a FAPE should provide for *all* of a child's special needs, not just academic, *Lenn*, 998 F.2d at 1089, and the Hearing Officer found Billy's IEP was not designed to do that.

> Because a one-dimensional view of an IEP would afford too narrow a foundation for a determination that the program is reasonably calculated to provide "effective results" and "demonstrable improvement" in the various "educational and personal skills identified as special needs," a district court's determination that an IEP complies with the Act necessarily involves a host of subsidiary determinations.

*Id.* at 1089-1090 (citations omitted).

After a thorough and exhaustive review of the entire record, the Court finds that it is undisputed that Billy's behavioral disability hampers his academic advancement and prevents any educational benefit. This reality has been obvious since his early childhood, routinely recognized by his teachers, and diagnosed by some of our state's leading mental health experts. His teachers have stated that his "behaviors continually get in the way of his academic work" and "because of his behaviors he has missed some essential skills, which have set him back." (Def. App. #21.) (emphasis added.) Although Billy's teachers found that he was academically capable, his behavior consistently got in the way of making academic progress. In fact, two

other school systems had recognized Billy's need to be educated in a specialized out-of-district placement. Dr. Barrett from Bradley Hospital stated:

> [Billy's] behavior also improved after being transferred by his public school to the highly structured Bradley School, during which time he began to make reasonable academic progress. However, following discharge to the public school setting, both his behavioral and educational gains were unable to be sustained."

(Def. App. #32 at 1.) Dr. Barrett also opined that:

> I was not surprised that behavioral and educational gains achieved at The Bradley School were not sustained upon his return to the public school classroom in the absence of intensive behavioral healthcare component."

*Id.* at 2.

As previously noted, the case law instructs that "[t]he *modus operandi* of the Act is the . . . 'individualized educational program.' . . . Congress incorporated an elaborate set of what it labeled 'procedural safeguards' to insure the full participation of the parents and proper resolution of substantive disagreements." *Town of Burlington*, 471 U.S. at 368. Billy's December 2007 IEP contained goals and objectives for his academic deficits, i.e., reading, writing and math. However, despite the resounding chorus of agreement that Billy's obvious and predominate behavioral disability was impeding his academic progress, his sixth grade IEP did not contain "clearly delineated behavioral goals" or "behavioral modification methods." (ECF No. 1-1 at 35.)[14] The IEP was not, as required by law "reasonably calculated to enable [Billy] to receive educational benefits." *Rowley*, 458 U.S. at 207. The Hearing Officer relied on this deficiency in Billy's IEP in determining that Coventry denied him a FAPE. This Court agrees with the Hearing Officer.

---

[14] Coventry argues that they did include a variety of behavioral management interventions in Billy's program while he was a student in their schools. Whether this is true, does not negate the undisputed fact that the IEP, the "primary vehicle" for delivery of a FAPE, was totally devoid of any behavioral goals or modifications.

Moreover, the IDEA mandates that "in the case of a child whose behavior impedes the child's learning" the IEP team must also consider "the use of positive behavioral interventions and supports, and other strategies to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i). Not having clear and defined behavioral goals and modifications in the IEP is tantamount to denying him any education at all. The record is abundantly clear that Billy's behavioral disabilities act like a boulder that blocks his way from making academic and educational advancements. The Coventry IEP's failure to recognize this and to provide for this is clear and convincing evidence that Coventry violated the IDEA.

The most credible evidence of whether Billy's IEP denied him a FAPE because it lacked behavioral goals came from the writings and testimony of his teachers and the staff at Coventry:

- "Our concerns for [Billy] center on his conduct, and most importantly on <u>the lack of progress</u> we have seen in any improvement in his conduct." (emphasis added) (Def. App. #22.)

- "[Billy] is a very capable student. <u>His behaviors continually get in the way of his academic work</u>. *** Because of his behaviors he has <u>missed some essential skills</u>, which have <u>set him back</u>." (emphasis added) (Def. App. #21.);

- "[I]f I [Coventry's Special Education Director] wrote that IEP . . . would I include a behavior goal and a social skills goals? Yes, I would." (Hearing Tr. 1-25-11 at 109.)

These statements demonstrate, in Coventry's dedicated staff's own words, how a failure to address Billy's behavioral needs in his IEP denied him a free appropriate public education.

Coventry has encouraged this Court to look at Billy's grades over the course of his educational career and to view the various ups and downs as proof that he received some

educational benefit because his grades at times were acceptable.  This Court acknowledges that such evidence exists.  But that would be the wrong focus of inquiry in this case.  Even if Billy's behavioral disabilities did not directly impede his academic advancement, the IEP still would have been deficient for failing to address those needs.  "[A] FAPE should provide for all of a child's special needs, be they 'academic, physical, emotional or social,' not just purely academic."  *Cranston Sch. Dist.*, 2008 WL 4145980, at *9 (quoting *Lenn*, 998 F.2d at 1089).  The necessity that Billy's IEP contain behavioral goals – even if he were excelling in academics – is indisputable based on the record before this Court.  As an IEP must address the full range if a child's needs, *Rochester, N.H.*, 875 F.2d at 970, and because Billy's IEP did not, the Court finds that he was denied a FAPE.

### B.    Proper Placement

Because the Court has found that Billy was denied a FAPE, it must next consider whether to require Coventry to reimburse Billy's Parents for the Chamberlain School tuition.  That decision is based on a determination of whether the Chamberlain School is a "proper" placement.  *See Florence*, 510 U.S. at 15; *Cranston Sch. Dist.*, 2008 WL 4145980, at *5.

For a private school to be "proper," the child's enrollment must be "reasonably calculated to enable the child to receive educational benefits."  *Rowley*, 458 U.S. at 207.  That does not mean, however, that the private school must meet all state standards to be considered proper, or be included on the state's list of approved schools.  *Florence*, 510 U.S. at 14.  As the Supreme Court in *Florence* noted, "'it hardly seems consistent with the Act's goals to forbid parents from educating their child at a school that provides an appropriate education simply because that school lacks the stamp of approval of the same public school system that failed to meet the child's needs in the first place.'"  *Id.* (quoting *Carter ex rel. Carter v. Florence Cnty. Sch. Dist.*

*Four*, 950 F.2d 156, 164 (4th Cir. 1991), *aff'd*, 510 U.S. 7). "The court must focus instead on the substance of the private school's teaching and services." *Cranston Sch. Dist.*, 2008 WL 4145980 at *12 (citing *Florence*, 510 U.S. at 11, 14).

School districts are obligated to place a child in a residential school when, due to the complexity of the child's disabilities, the child needs consistent instructional and therapeutic interventions throughout his or her waking hours in order to make meaningful educational progress. In such cases, a therapeutic residential placement is deemed necessary for educational reasons, and the school district must provide such a placement. *Abrahamson v. Hershman*, 701 F.2d 223, 227 (1st Cir. 1993); *Linda E. v Bristol Warren Reg'l Sch. Dist.*, 758 F. Supp. 2d 75, 92 (D.R.I. 2010).

The Hearing Officer, as fact-finder, made credibility findings as to the experts and evidence presented at the hearing with which this Court, after reviewing the entire record, independently agrees. The Court's reasoning is best summed up by the Hearing Officer's decision where he ruled "[t]he evidence is clear and convincing that a therapeutic residential placement where [Billy] has a continuing contact with his parents to abate his anxiety issue is necessary and to allow him to attend to his peer relationship and his academic progress." (ECF No. 1-1 at 31.) The Hearing Officer concluded that:

> The enrollment of [Billy] at the F.L. Chamberlain School was necessary for educational reasons, was reasonable and in the best interest of [Billy] which, in light of his disabilities, was reasonable [sic] calculated to provide [Billy] with a proper behavior modification program to allow him to make academic progress in the least restrictive environment.

(ECF No. 1-1 at 36.) The record reveals that the Chamberlain School was, and remains,

appropriate for Billy, whose behaviors were at an extreme level rarely found in other children.[15]

Dr. Rowland Barrett, whose credentials from Bradley Hospital and lengthy professional contact

with Billy make his professional opinion particularly credible and compelling, stated that Billy

needs "[p]lacement at a residential school that geographically allows frequent direct family

contact and incorporates an intense behavioral component (including 24 hr/day milieu therapy.)"

(Def. App. #32 at 2.)  He specifically endorsed the Chamberlain School as the type of unique

special education setting that Billy needed: ". . . it is abundantly clear that Billy requires a

unique special education setting, such as the F.L. Chamberlain School."  (Def. App. #32 at 2.)

This Court finds that Dr. Barrett's opinion is highly reliable and appropriate.  This Court agrees

with his expert opinion that given Billy's background, the Chamberlain School is an appropriate

placement.

**C.     Procedural Deficiencies**

Billy's Parents also claim that Coventry's procedural violations constitute a further denial

of FAPE.  They allege that when Coventry's Director of Special Education in her letters of June

24, 2008 and December 31, 2009 (Def. App. #25, #27) summarily dismissed the Parents'

concerns about Billy's education and advised the Parents that Billy's current IEP and placement

were appropriate, Coventry effectively predetermined his placement without any input from

either the Parents or an IEP Team.  In so doing, the Parents assert that Coventry deprived the

Parents of their fundamental right to be full participants in the decision-making process regarding

their child's special education, and also deprived Billy himself of his right to have his needs

---

[15] Coventry points to Billy's report card for the academic year 2010-2011 to support its
contention that the Chamberlain School is not an appropriate placement for Billy.  This Court has
considered the entire year report card (pursuant to 20 U.S.C. § 1415(i)(2)(c)), but finds that the
single report card grades are not dispositive of whether the Chamberlain School is proper
placement.  This Court has given much more credence to the factors listed above in its opinion
that the Chamberlain School is a proper placement.

determined, and his educational program developed collaboratively by a duly-constituted IEP Team.

This Court need not address these procedural issues because of its ruling upholding the Hearing Officer's order that Billy continue at the Chamberlain School and that Coventry reimburse Billy's Parents for his therapeutic residential placement.

## V.  CONCLUSION

This Court is fully aware of the implications of its Order.  As the United States Supreme Court expressed:

> There is no doubt that Congress has imposed a significant financial burden on States and school districts that participate in IDEA.  Yet public educational authorities who want to avoid reimbursing parents for the private education of a disabled child can do one of two things:  give the child a free appropriate public education in a public setting, or place the child in an appropriate private setting of the State's choice.  This is IDEA's mandate, and school officials who conform to it need not worry about reimbursement claims.

*Florence*, 510 U.S. at 15.  IDEA's mandate in this case is for Billy to receive an appropriate education that allows him some educational benefit.  This Court, after an extensive review of the entire record holds that the Hearing Officer was correct that Billy was denied a FAPE and that the Chamberlain School is an appropriate placement for which Coventry should be financially responsible.

Because this Court affirms the decision of the Hearing Officer, Plaintiff's Motion for Summary Judgment (ECF No. 16) is DENIED and the Defendants' Motion for Summary Judgment (ECF No. 19) is GRANTED.

The Defendants shall present an appropriate order and judgment.

IT IS SO ORDERED.

John J. McConnell, Jr.
United States District Judge

September 28, 2012